## PUTNAM vs. RITCHIE and others.

Where the owner of leasehold premises under a lease in fee, died leaving several infant children, and their mother, who was the administratrix of his estate, assigned the lease to the owner of the rent as heir of the lessor, in consideration of his discharging his claim for the rent against the estate of the decedent ; *Held*, that the assignment was void, and that the children of the decedent were not divested of their legal estate in the premises ; and that the assignee of the lease having, under a misapprehension of his legal right to the premises, made large and valuable improvements thereon, the owners of the legal estate were not bound to pay him for those improvements.

Previous to the revised statutes, tenants in common could hold their several shares in the property by different tenures.  And where one third of the property is held by a tenant in common in allodium, and the other two thirds are held by others by a socage tenure, a subsequent purchaser who unites the titles of all the tenants in common in himself, holds the different undivided portions of the property by separate and distinct tenures.

Where infants took lands by descent, two thirds of which were held by their father in free and common socage and the other third in allodium ; *Held*,

that the mother was entitled to the custody of the children and to the care of the lands as their guardian in socage.

A guardian in socage has no right to surrender a lease in fee belonging to her wards; neither can she lease their freehold estate for a longer period than during the probable continuance of such guardianship.

Where the legal title to property is in a trustee, or where the guardian of an infant has a complete legal control over the property, so as to place it fully within the power of the chancellor as the general guardian of infants, the court may sanction the acts of the trustee or guardian, although not strictly legal, if the same are done in good faith and for the benefit of the estate of the infant. And the court sometimes interferes to compel the performance of marriage contracts made in behalf of infants, where the marriage has been consummated on the faith of such agreement. With these exceptions, chancery never interferes to deprive an infant of his estate, which has been disposed of without authority during his infancy, unless upon some new equity arising out of his subsequent acts or acquiescence.

The rule of the civil law in regard to industrial accessions to the property of another, made in good faith by a bona fide possessor, has not been adopted in England or in this state, except so far as to allow him to offset, or recoupe in damages, the value of such industrial accessions, against the owner's claim for rents and profits during the occupancy of the person who made the improvements upon the property.

But where industrial accessions have been made to property in good faith by a person who has the legal title to the property, so that the real owner is compelled to resort to the court of chancery to assert his equitable title to such property, this court acts upon the civil law rule of natural equity, and compels the complainant to compensate the adverse party for such industrial accessions, or improvements, as a condition of granting the equitable relief asked for in the suit.

Where facts are distinctly put in issue by the pleadings, the examiner cannot reject evidence which is material to prove such facts, on the ground that the matters put in issue by the pleadings are immaterial. Therefore the court, upon an application to expunge such testimony, will not decide upon the materiality of the issue upon such facts.

The bill in this cause was filed against the children and heirs of John Ritchie, deceased, one of whom was an infant, to restrain the further prosecution of an ejectment suit brought by them against the complainant, to recover the possession of a village lot, at Saratoga Springs, under the following circumstances: The premises in question were a part of lot No. 12, in the 16th allotment of the Kayaderosseras patent. That lot, upon the partition of the patent, in 1772, fell to the original share of Rip Van Dam, and the title to the same, previous to the act of attainder of the 22d of October, 1779, was in Isaac Low, J. Walton and A. Van

Dam, as tenants in common, who held the same by socage tenure. Upon the attainder of Low, his undivided share of the lot was sold by the commissioners of forfeitures to H. Livingston. The father of the complainant afterwards became the owner of a part of lot No. 12, including the premises in question, under the title of Walton, Livingston and A. Van Dam, and in 1812, he leased the village lot in question to John Ritchie in fee, at an annual rent of $20, with the usual power to distrain, or to re-enter, for non-payment of the rent. The lease also contained a clause that the rent should cease and that the lessee or his legal representatives should have an absolute conveyance in fee upon the payment of $300 at any time within five years. G. Putnam, the father of the complainant, died in December, 1812, and upon the partition of his estate, in February, 1814, the rent and reversion of the premises in question fell to the share of the complainant. Ritchie, the lessee, died about one year after the execution of the lease, intestate, leaving about $1000 clear personal estate, and the undivided half of a house and lot at Ballston Spa, besides the premises in question. He also left three children, the defendants in this cause, his only heirs at law, the eldest of whom was then under five years of age; and administration upon his estate was shortly afterwards granted to the widow. In June, 1814, the administratrix, through the agency of Sellick, her brother, who was permitted to act for her in the management of the estate of her deceased husband, made an arrangement with the complainant by which the latter was to receive the two years rent then due and to take back the premises. The administratrix was advised to adopt this course as most beneficial to the estate, the premises leased having no buildings thereon and producing very little besides the taxes. The complainant received the rent, according to the agreement, and took from the administratrix an assignment, under her hand and seal, upon the back of the lease; by which assignment she granted, sold and assigned the lease and the premises therein described to him and his heirs and assigns forever, he saving her as well as the heirs of Ritchie harmless from the covenants, conditions and rents

Contained in the lease. And she also covenanted with the assignee to warrant the premises to him against all claims of such heirs. The complainant thereupon took possession of the lot and continued in possession and paid the taxes, claiming it as his own, until the fall of 1828, when he commenced building a large brick house thereon; which house was completed, except painting, in the spring of 1830. Julia Ann Ritchie, one of the heirs, became of age in August, 1829, and her sister who was previously married to Cook, who was himself a minor, became of lawful age in September, 1831. The parties having in the spring or summer of 1831 ascertained that their father had died seized of the premises, and that the lease had been given up by the mother and uncle who had suffered the principal part of their other property to be wasted, and were insolvent, commenced an ejectment suit, in the fall of that year, against the complainant, in the names of all the heirs of Ritchie, to recover possession of the lot. Upon the filing of the bill in this cause an *ad interim* injunction was granted, restraining the further prosecution of the ejectment suit; which injunction was afterwards modified so as to permit the suit at law to proceed to trial and judgment, but without prejudice to the complainant's equitable rights. The ejectment suit was afterwards tried and judgment was rendered therein against the complainant. (*See Ritchie* v. *Putnam*, 13 *Wend. Rep.* 524.) The bill and answers in this cause put in issue various matters as to the tenure by which the premises were held at the time of the death of Ritchie; the value of the lot at the time it was given up to the complainant; its value, exclusive of the buildings and improvements made thereon by the complainant, at the time of the commencement of this suit; the circumstances and negotiations which led to the assignment of the lease by the administratrix; the information and advice which the complainant received at that time as to the want of power to revest the title in him without a formal re-entry; the loss of the other property of the defendants by the negligence of the administratrix, and the frauds of Sellick, who procured himself to be appointed their guardian, in 1816, under an order of the surrogate and

without sufficient security ; and as to the knowledge of the defendants that the complainant was going on to make valuable improvements on their lot, and their not giving him notice that they intended to disaffirm the agreement of 1814 for the giving up of the lease. And many witnesses were examined as to the several matters thus put in issue by the pleadings.

The counsel for both parties gave notice that they would at the hearing move to expunge certain portions of the testimony, which they had respectively objected to upon the examination of the witnesses, as irrelevant or impertinent ; the decision of which questions was reserved by the chancellor until after the hearing of the cause upon the merits.

*W. L. F. Warren & S. Stevens*, for the complainants. The lands in question are held by socage tenure. By the original grant the lands were to be held by the tenure of East Greenwich. East Greenwich is in the county of Kent ; all lands in Kent are held in socage and by the custom of gavel kind. The statute of 1691 changed all tenures into that of free and common soccage ; therefore the mother of the infants was guardian in socage, and she is presumed in law to have entered as guardian in socage. The disposition of the lands of the ward by the guardian in socage, if beneficial to the ward, will be sanctioned by the court and made obligatory upon the ward. The writing under which the complainant claims title was intended to be, and is in equity a surrender of the lease. The surrender of the lease, at the time it took place, was beneficial to the defendants ; the lot was then not worth the rent which they were bound to pay. The defendants are precluded from setting up their title ; they knew their rights, knew the complainant was making improvements ; their silence was an act of fraud on their part. If complainant has not an equitable title, defendants should be required to allow the rent and pay for the improvements, and the complainant should only be charged with the annual value of the land as it was at the time of the surrender. (5 *John. Rep.* 67. 10 *East,* 491. 7 *John. Ch. Rep.* 154. *Amb.* 419. 1 *Vern.* 493. 1 *Atk.* 480, 489. *Prec. in Ch.*

319.  18 *Ves.* 272.  *Eq. Cas. Abr.* 287.  1 *Fonbl. Eq.* 77, *n. a.*  2 *Vern.* 224.  9 *Ves.* 19.  1 *Fonb.* 74.  2 *P. Wms.* 243.  1 *Bro. Ch. Cas.* 106.  *Bing. on Infancy, &c.* 66, 93, 94, 112.  2 *Fonbl.* 229, *note.*  15 *Ves.* 448.  1 *Mad. Ch. Pr. tit. Infant,* 262.  6 *Ves.* 474.  9 *Vin.* 914, *Infant, pl.* 24.  1 *Sch. & Lef.* 352.  6 *John. Ch. Rep.* 166.  15 *Mass. Rep.* 220.  3 *John. Ch. Rep.* 368, 370.  *Jer. Eq.* 216, 219, 222.  15 *Ves.* 445.  2 *Kent's Comm.* 220, 2d ed.  *Sugden on Vend.* 380.  9 *Mod. Rep.* 35, 36, 37.  *Co. Lit.* 88, *a.*  *Har. Notes,* 67.  6 *Jac. Law Dict.* 156, *Surrender.*  *Co. Lit.* 335, *a.*  *Cro. Jac.* 99.  2 *Ves. sen.* 212.)

*J. Ellsworth & M. T. Reynolds,* for the defendants.  There is no trust shown affecting the legal title, or that can give the court jurisdiction over the legal title, so as to authorize a claim for a release or conveyance of the legal title.  The lot was not holden under socage tenure.  (*Co. Litt.* § 117, 118. 2 *Black. Comm.* 78.  1 *Greenl. Laws,* 31, 27, 127, 360.)  A release of a thing indivisible operates as to the whole.  (*Co. Litt.* § 447, 454, *p.* 268, *a.* § 479, *p.* 280, *a.* § 559, 560.)  The trust of guardian was never assumed or acted under by the mother.  (1 *John. Rep.* 164.  3 *Wils.* 527.)  No act was done by her as guardian, and the trust of guardian in socage did not extend to the legal title beyond 14 years of age.  (2 *Kent's Comm.* 2d ed. 223.  14 *Vin. Abr.* 172, 185.  *Vaugh. Rep.* 178, 188.  *Plowd.* 293.)  And as trustee she had no power to change the nature of the estate.  (*Amb.* 419, *and cases cited.*  11 *Ves.* 278.  *Milnor* v. *Harwood,* 18 *Ves.* 273. 19 *id.* 122.  *Genet's case,* 1 *John. Ch. Rep.* 564.  *Root* v. *Worth,* 1 *Ves. sen.* 461.  *Taylor* v. *Phelps,* 2 *Ves. jun.* 23.)  The change was manifestly to the injury of the defendants, and for the benefit of the personal representative.  (2 *Williams' Ex.* 1074.)  The personal estate was the proper fund out of which to pay the rent reserved.  There is no fraud shown here that can raise a trust by implication.  (12 *Serg. & Rawle,* 399.  1 *Atk.* 480.  2 *id.* 82.)  There was no mistake either in law or of fact; and rent is not recoverable at all.  (4 *Cowen,* 581.)  Neither are the defendants bound to elect either to pay for improvements or release their title.

This is not a case ef election. (*Green* v. *Biddle,* 8 *Wheat.* 1. 1 *J. J. Marsh. Rep.* 405.)

THE CHANCELLOR. The complainant's objection to the part of the testimony of Mrs. McNelly which relates to the amount of the proceeds of the real and personal estate which she actually received from Sellick, her brother and agent, appears to be well taken. This testimony does not relate to any matter put in issue by the pleadings, and is wholly irrelevant. It is immaterial in this suit whether the property of the infants, which ought to have been appropriated for the payment or extinguishment of the rent of this lot or otherwise invested for their benefit, has been lost by the administratrix herself or by another who has been permitted to act as her agent. The objection, on the part of the defendants, to so much of her testimony as relates to the declaration of Ritchie as to the place of his birth, is also well taken. No question as to his alienage, or as to his right to transmit the premises by descent to his children, was raised or even suggested in the pleadings. Indeed if the complainant had stated in his bill that Ritchie was an alien at the time of his death, he would have shown that he had no pretence for coming into this court for relief, as he would in that case have had a perfect defence to the ejectment suit at law. And he would also have shown that the lot in question belonged to the people of the state, by escheat, and not to him ; so that his bill against these defendants must in that case have been dismissed with costs, on the ground that upon his own showing he had no claim to any decree against them. These parts of the deposition of Mrs. McNelly must therefore be expunged.

The parts of the testimony of other witnesses, which are objected to by the complainant's counsel, went to the establishment of several allegations which were distinctly made in the defendants' answer ; and for that reason the testimony was properly received by the examiner. If these allegations in the answer were wholly irrelevant to the subject of the suit, the complainant should have excepted to them as impertinent. But having been put in issue by the repli-

cation, the examiner had no authority to decide upon the materiality of the issue upon the offer of testimony to establish the truth of the answer. Neither will the court, upon a motion to expunge testimony, decide the question collaterally whether a particular allegation in the bill or answer is pertinent or impertinent. Upon the hearing of the cause, however, the court will disregard the impertinent allegation as well as the proof in relation to the same; and the vice chancellor or master who taxes the costs is directed by statute to make no allowance for either. (2 *R. S.* 653, § 5.) The same answer may be given to the defendants' objection to a part of the testimony of Palmer, as it went to establish an allegation contained in the bill. The objection before the examiner was not put upon the ground upon which it was afterwards attempted to be sustained here. The defendants' objection to a part of the answer of Blake, to the interrogatory whether the complainant did not take an active part in the settlement of his father's estate, must also be overruled. The interrogatory itself appears to be impertinent, and the party putting it should not be allowed to retain one part of the answer thereto and expunge the other. Where an impertinent interrogatory is put to a witness, it does not lie with the party putting it to object that a part of the answer thereto is impertinent, if the part complained of is necessary to prevent an improper inference being drawn from that part of the answer which is responsive to the interrogatory. Here, if it was material to the defence of these defendants to show that the complainant took an active part in the settlement of his father's estate, it was probably as material that the court should know the fact that he was at that time a minor, and therefore not accountable for his acts.

The evidences of the title, under which the premises in question were held by Ritchie at the time of his death, establish the fact that the mother of the defendants had by the common law a right to claim their guardianship, by reason of the descent to them *ex parte paterna* of a freehold estate in land, an undivided two thirds of which was held by socage tenure.

By the act concerning tenures, (1 *Greenl. Laws*, 359,) lands in this state granted by the crown were declared to be held in free and common socage, and 'all lands granted by the state or by the commissioners of forfeitures were to be held in pure allodium only. And as the counsel for the defendants supposed that feudal and allodial tenures could not exist together in the undivided portions of the same lot, they insisted, upon the argument, that the attainder of Low and the sale of his undivided third of lot No. 12 to Livingston, by the commissioners of forfeiture, changed the tenure of the whole lot from feudal to allodial. But it is not necessary that there should be either unity of tenure in the different portions of the land, or unity of estate in the several owners thereof, to constitute a tenancy in common. Unity of right of possession merely is all that is required. The sovereign power of the state, therefore, as the owner of lands not already granted, may dispose of an undivided moiety thereof to be held by feudal tenure by one person, and the other moiety to be held in allodium by the other, and the different grantees will be tenants in common. So if different portions of the land are held by tenants in common by the same tenure, if the share of one tenant in common again becomes vested in the sovereign power, by escheat, forfeiture or otherwise, that share may be granted to another person by a different tenure, without in any manner affecting the tenure by which the other shares of the same land are held. In this case, upon the attainder of Low and the conveyance to Livingston, his share of the lot became allodial, while those of Walton and Van Dam, even after they all became united in the same person by subsequent conveyances, continued to be held by socage tenure as before ; until the recent revision of the laws changed all the feudal tenures in the state into pure allodium. And the mother of the defendants, being entitled to the custody and control of their persons and the care of their socage lands, as their guardian in socage, until they had respectively attained the age of fourteen, the better opinion appears to be that she was also entitled to the care of the other third of the premises in dispute, although that third was not held by a feudal tenure but in allodium,

1837.

Putnam
v.
Ritchie.

the same having come to the children by descent from the same ancestor. (*Co. Litt.* 88, *a.* § 123, *n.* 67. *Church* v. *Cudmore,* 2 *Lutw.* 1190. 2 *Kent's Comm.* 223.)

I cannot perceive, however, that the decision of this question as to the right of guardianship in favor of the complainant is calculated in any manner to aid him upon the decision of the main question in the cause. It is evident from the testimony in the case, that the administratrix was not aware of the fact that the lands in question were held by socage tenure, or that she had any right to the custody of the children or the care and management of their lands as guardian in socage; or that the complainant himself supposed he was dealing with her in the character of guardian. As she only had the right to enter in her character as guardian when she leased the premises to Sharp from year to year, the law will presume that she was in as such guardian, and that the infants were seized of the premises in consequence of her rightful possession, until she was guilty of an act which was of itself a disseizin of the infants by selling and assigning the premises in fee. (*Podger's case,* 9 *Coke's Rep.* 106, *a.* *Goodtitle* v. *Newman,* 3 *Wils.* 516. *Bro. Abr.* 235, *tit. Descent, pl.* 19. *Byme* v. *Van Hoesen,* 5 *John. Rep.* 66.) It could not, however, have altered Putnam's legal rights in this case if she had actually assumed the guardianship, and had sold and assigned the lease to him in the character of guardian for the children; as by the common law neither the guardian in socage or any other guardian had any power or authority to surrender a lease in fee, or to lease the freehold estate of the ward for any longer time than during the probable continuance of the trust: that is, in the case of guardianship by will until the age of twenty-one, and of guardianship by socage until the age of fourteen. (*Roe* v. *Hodgson,* 2 *Wilson,* 129. *Doe* v. *Bell,* 5 *Durn. & East,* 471. *Litt.* § 123. *Cary's Comm. on Litt.* 240.) Here the written instrument executed by the mother does not purport to be a surrender of the lease, but an assignment or conveyance from her in her character of administratrix. And as she had no power, either in her character of guardian or as administratrix, to

make a surrender, the court cannot legally construe that into a surrender which upon its face purports to be an assignment of the lease and a sale of the leasehold premises. Even if parol evidence were admissible to contradict the terms of this instrument under seal, the proof shows that it was not intended to be a surrender of the lease in the character of guardian. And both parties, and probably the counsel for the widow who drew and witnessed the assignment, acted upon the erroneous supposition that the personal representative of the decedent had a legal right to sell and assign the lease, without adverting to the distinction in this respect between a lease in fee and a lease for a term of years only.

An estate *pur auter vie*, which by the English law when limited to a man and his heirs or devised by will went to the heir or devisee as special occupant, was a descendible freehold. And as it appears from the case of *Pierson* v. *Shore*, cited by the complainant's counsel from Atkyn's Reports, that a lease of such an estate was surrendered by the guardian and afterwards approved by Lord Hardwick, it is supposed that case is evidence of an authority on the part of the guardian to make such a surrender of a freehold estate. A much fuller statement both of the facts of that case and of the opinion of the court is, however, found in a more recent publication taken from Lord Hardwick's own note book. (1 *West's Rep.* 711, *S. C.*) And it there appears that the guardians did not consider themselves as legally authorized to surrender the lease, even for the purpose of claiming a renewal upon the falling in of one of the lives upon which the continuance of the lease depended. But as the guardians and trustees were invested with very extensive powers in relation to the management of the estate, although the testator probably through mere inadvertence had not authorized them to surrender the lease for the purpose of renewal, they did what Mr. Blake the counsel of Putnam suggested in this case as the only legal mode of revesting the legal title in the heir of the lessor: that is, they permitted the lessors to re-enter and forfeit the lease for the non-payment of rent, but under a verbal under-

standing that a new lease should afterwards be granted upon other lives, for the benefit of the infant, according to the trusts of the will. And as Lord Hardwick considered this new lease a beneficial purchase, and as within the authority conferred by the will to make such purchases, he decided that the new lease, upon the death of the infant, went to his heirs on the part of the father, as a newly acquired estate; although the original lease came to the infant on the part of the mother. I have no doubt that in this case the assignment of the lease by Mrs. Ritchie was absolutely void at law, and that the legal estate in the premises is still in the defendants. It remains therefore, to be seen whether the complainant has any claim for relief in equity, under the circumstances disclosed in the pleadings and proofs.

There is a class of cases, where the fund belonging to the infant was in the legal power and disposition of the guardian, or where the legal estate was in trust so as to place it fully within the power of the court of chancery as the general guardian or protector of the rights of infants, in which the court has sanctioned acts of the guardian or trustee which were not strictly legal, but which were done in good faith for the benefit of the estate of the infant. There are also some cases of marriage settlements, which in England are governed by legal principles somewhat peculiar, where the court of chancery has interfered to compel an infant or his heirs to fulfil a marriage contract, entered into by such infant with the concurrence of his natural or legal guardians, and where the marriage has been consummated upon the faith of such an arrangement. With these exceptions I am not aware of any case in which this court has interfered to deprive an infant of the legal estate, which had been disposed of without authority during his infancy, unless it was upon some new equity arising out of his conduct, or his acquiescence in the contract or the receipt of the profits or proceeds of the contract, after he became of age. In the case of *Smith* v. *Low*, (1 *Atk.* 489,) which is more fully reported by West, the decision is put mainly upon the ground of acquiescence; the infants having received the rent under the lease, made by the guardian for their benefit,

for the period of ten years after the youngest of them was of full age.

In the present case there has been nothing in the conduct of any of the defendants, after they became acquainted with their legal right to the property, which can be considered as fraudulent towards the complainant or as an acquiescence in the assignment of the lease. Even if they had known all the facts of the case as he knew them, I have no right to presume these girls were better acquainted with the law than he was; and if both are chargeable with notice of the general law of the state, he knew the legal title was in the defendants notwithstanding the surrender. He should, therefore, have waited till they became of age, and then have ascertained from them whether they intended to sanction the giving of the lease, before he proceeded to erect a valuable house upon the premises. But if he really supposed the assignment gave him a legal title to the premises, as he probably did, I may well suppose they were equally ignorant of their legal right to the lot, although some of them had heard that their father once owned it. From the evidence in the case I am satisfied they could not probably have known the facts upon which their rights depended until the summer of 1831, after the buildings had been erected. And they promptly asserted their claim immediately after the second sister became of age, in the fall of that year.

From the facts in this case, however, I have reason to believe the complainant has acted under a misapprehension of the legal effect of the assignment of the lease, although he has not been able to prove that he was advised by counsel that it would be valid and sufficient to reinvest him with the title; and that, under such misapprehension, he has made improvements which are far more valuable than the lot itself. The question therefore is, whether this court has the power to prevent the defendants from taking the benefit of these improvements without making any compensation therefor.

Foreseeing the difficulties of doing justice between the parties consistent with the principles upon which this court

has hitherto acted, and not considering myself authorized to establish a new head of equity jurisdiction in the decision of this case, I intentionally refrained from deciding the motion for the dissolution of the injunction until the infant defendant had arrived at the age of 21, and have suspended the final decision upon the pleadings and proofs some considerable time since the hearing, hoping that one party or the other might propose some terms of compromise which would lead to a settlement of this unfortunate controversy. But as neither party appears to be disposed to yield any thing to the other, it becomes my duty to put an end to the suit, so far at least as the decision of this court can do it; leaving the party who is dissatisfied with that decision to a review of the same in the court of dernier resort.

As the lot was situated at the death of Ritchie, it would have been for the interest of the defendants to give up the lot, instead of applying their personal estate for the payment or extinguishment of the rent, if such personal estate instead of being wasted had been securely invested for their benefit; although the income and probable increase of the value of the lot, in the hands of a person who was in a situation to use it to advantage by erecting a building thereon, would have been greater than the interest of the $300 required to be paid to extinguish the rent. The result proves, however, that it would in fact have been much better for the defendants that their personal estate in the hands of the administratrix should have been applied to the payment or extinction of the rent, instead of being wasted by her or her agent. The arrangement for giving up the lease being wholly unauthorized, the defendants are therefore entitled to the benefit of the natural increase in the value of the property since that time. I am not aware that the law of any civilized country has directly deprived the legal owner of property of the natural accession to the same; although the supreme court of the United States, in the case of *Green* v. *Biddle*, (8 *Wheat. Rep.* 1,) appear to have supposed that the occupying claimants' law of Kentucky was calculated to produce that effect indirectly. But the rule of natural equity appears to be different in regard to industrial ac-

1837.

Putnam
v.
Ritchie.

cessions, or permanent improvements made upon the property of another by a bona fide possessor. By the rules of the civil law, the possessor of the property of another who had erected buildings or made other improvements thereon in good faith, supposing himself to be the owner, was entitled to payment for such improvements, after deducting from the value thereof a fair compensation for the rents or use of the property during the time he occupied it. (*Puff. B.* 4, *ch.* 6, § 6. *Code Nap. art.* 555. 3 *Partida, tit.* 28, *law* 41. *Bell's Law of Scot.* 130, *art.* 538. *Rutherf. Inst.* 71. *Inst. of Law of Spain*, 102.) This principle of natural equity has been adopted by the law of England and of this state to a limited extent, in the action for mesne profits; where the bona fide possesor of property is permitted to off-set, or recoupe in damages, the improvements he has made upon the land, to the extent of the value of the rents and profits during his occupany.

Here the use of the lot, subject to the widow's right of dower which the complainant is equitably entitled to under her assignment of the lease although it could not be sold so as to pass the legal title before it was set off to her, is probably equal to two thirds of the rent reserved upon the lease. And if I felt myself authorized to introduce this principle of natural equity into the law of this court farther than it has yet been adopted here, I should direct a reference to a master to ascertain the present value of the lot exclusive of the buildings, subject to the widow's dower and to the future rents exclusive of her share thereof, and also to ascertain the present value of the buildings subject to the right of dower therein; and should give the defendants the right to elect, upon the coming in of the master's report, whether they would retain the legal title to the lot subject to the rent and right of dower, and pay to the complainant the value of such improvements, or would release to him their legal estate in the premises upon being paid the value thereof, as thus ascertained, exclusive of the buildings.

This principle of natural equity is constantly acted upon in this court where the legal title is in the person who has

1837.

Putnam
v.
Ritchie.

made the improvements in good faith, and where the equitable title is in another who is obliged to resort to this court for relief. The court in such cases acts upon the principle that the party who comes here as a complainant, to ask equity, must himself be willing to do what is equitable. I have not, however, been able to find any case, either in this country or in England, wherein the court of chancery has assumed jurisdiction to give relief to a complainant, who has made improvements upon land the legal title to which was in the defendant, where there has been neither fraud or acquiescence on the part of the latter after he had knowledge of his legal rights. I do not, therefore, feel myself authorized to introduce a new principle into the law of this court, without the sanction of the legislature, which principle in its application to future cases might be productive of more injury than benefit. If it is desirable that such a principle should be introduced into the law of this state, for the purpose of giving the bona fide possessor a lien upon the legal title for the beneficial improvements he has made, it would probably be much better to give him a remedy by action at law, where both parties could have the benefit of a trial by jury, than to embarrass the title to real estate with the expense and delay of a protracted chancery suit in all such cases.

The only relief which I consider myself as authorized by the law of the land and the settled principles of this court to give to the complainant, is to protect him in his equitable right to the use of one third of the premises during the life of the mother of the defendants, he paying one third of the ground rent and taxes during that time; and also to restrain the defendants from taking possession of the other two thirds of the lot, under their recovery in the ejectment suit, until they shall have paid or tendered to him two thirds of the ground rents which have accrued since he took the assignment of the lease, with interest upon the respective payments from the time such rent became payable by the terms of the lease; and also his costs in this suit to be taxed The value of the improvements, or of the two thirds thereof, must very greatly exceed the use of the defendants' share of the property and the whole costs of this litigation.

The defendants, therefore, cannot affirm the surrender, or giving up of the lease, so far as to deprive the complainant of his equitable title to two thirds of the rent which they would have been compelled to pay if the surrender of their interest in the property had not been attempted to be made, and at the same time be allowed to disaffirm the transaction for the purpose of giving themselves the benefit of his improvements. If they disaffirm the act of their mother so far as relates to their interest in the property, the complainant must have the benefit of that disaffirmance pro tanto. And being therefore equitably entitled to two thirds of the rent, with a right of re-entry for the non-payment thereof, this court will not suffer him to be turned out of possession until the back rent is paid. And as the statute has left the subject of costs in the power of the court to be disposed of according to equity, where the complainant succeeds either wholly or in part, I feel myself fully justified in this case in giving to the complainant the costs in this court, as a kind of equitable offset against the valuable improvements which he has made upon the lot; which improvements the defendants will have the benefit of under this decree. The injunction must, therefore, be so far modified as to permit the defendants to take possession of two thirds of the premises, and to collect their costs in the ejectment suit, upon the payment of such back rent and costs, and to take possession of the whole after the death of the mother. If the parties cannot agree upon an assignment of dower to the complainant as the equitable owner thereof, or to an alternate occupation of the whole premises, either party is to be at liberty to apply to the court for further directions upon the subject, upon petition and due notice to the adverse party.